**David BURTON, Plaintiff,**

**v.**

**R.J. REYNOLDS TOBACCO COMPANY, et al.,**
**Defendants.**

**Case No. 94–2202–JWL.**

United States District Court,
D. Kansas.

May 9, 2002.

Kenneth B. McClain, Nicholas E. Mebruer, Nimrod T. Chapel, Jr., Donald H. Loudon, Jr., Scott B. Hall, Humphrey, Farrington, McClain & Edgar, Independence, MO, Gregory Leyh, Kansas City, MO, for Plaintiff.

M. Waren McCamish, Williamson & Cubbison, Kansas City, MO, John C. Noonan, Teresa L. Clark, Stinson, Morrison, Hecker, LLP, Kansas City, MO, Stanley D. Davis, Shook, Hardy & Bacon, L.L.P.,

Kansas City, MO, Junius C. McElveen, Jr., Jones, DAy, Reavis & Pogue, Washington, DC, Sydney Bosworth McDole, William E. Marple, Thomas C. Pavlik, Clay Alfred Hartmann, Stephen B. Yeager, Catherine L. Bjorck, Jones, Day, Reavis & Pogue, Dallas, TX, Stephen J. Kaczynski, Michael A. Nims, Paul G. Crist, Randal S. Baringer, Jones, Day, Reavis & Pogue, Cleveland, OH, Roger D. Stanton, Berkowitz, Feldmiller, Stanton, Brandt, Williams & Stueve, LLP, Prairie Village, KS, for R.J. Reynolds Tobacco Co., Inc.

James D. Griffin, Blackwell, Sanders, Peper & Martin, LLP, Kansas City, MO, Frank C. Woodside, III, Mary-Jo Middelhoff, Dinsmore & Shohl LLP, Cincinnati, OH, Bruce G. Sheffler, James Mirro, Pater K. Eck, Nicholas Booke, Chadbourne & Parke, LLP, New York City, Roger W. Warren, Sanders, Conkright & Warren, LLP, Kansas City, MO, James M. Warden, Warden Triplett Grier, Overland Park, KS, for The American Tobacco Co., Brown and Williamson Tobacco Corp.

## MEMORANDUM AND ORDER

LUNGSTRUM, District Judge.

On February 22, 2002, a jury rendered a verdict in favor of plaintiff David Burton against R.J. Reynolds Tobacco Company ("Reynolds") and American Tobacco Company ("American")[1], awarding compensatory damages against both Reynolds and American and authorizing an award of punitive damages against Reynolds. Both Reynolds (Doc. 653) and American (Doc. 655) request that the court set aside the jury's verdict and enter judgment as a matter of law in favor of defendants pursuant to Federal Rule of Civil Procedure 50(b) or, alternatively, order a new trial pursuant to Federal Rule of Civil Procedure 59.

Reynolds and American advance numerous arguments in support of their motions. The court has carefully considered each argument in turn and rejects them for the reasons set out more fully below. In summary form, however, the court believes that the jury's verdict was well grounded in the evidence and the law and should be upheld.

The evidence presented at trial was such that a reasonable jury was entitled to find that the defendants had or should have had knowledge that the cigarettes they manufactured and sold to Mr. Burton and the world at large were addictive and caused peripheral vascular disease; that they failed to warn the public, including Mr. Burton, of these dangers before the 1969 warning preemption took effect; that they failed to test their products to ascertain the full hazardous nature of them as regards addiction and peripheral vascular disease; and that they set out on a very successful campaign, beginning in the 1950s, at or before the time Mr. Burton began to take up smoking, to conceal from the public, including Mr. Burton, the true hazardous nature of cigarettes, including specifically that they are addictive and cause peripheral vascular disease. These facts are sufficient to support the jury's verdict in all of its particulars. As a result, the defendants' motions are denied.

I. Standards

A. Judgment as a matter of law

Judgment as a matter of law under Rule 50(b) "should be cautiously and sparingly granted," *Black v. M & W Gear Co.*, 269

---

**1.** Brown & Williamson Tobacco Corporation, the successor in interest to American, was substituted for American as the party defendant in this case but, in keeping with the

practice at trial, in order to reduce confusion, the court refers to that defendant as "American" in this Memorandum and Order.

F.3d 1220, 1238 (10th Cir.2001), and is appropriate only if the evidence, viewed in the light most favorable to the nonmoving party, "points but one way and is susceptible to no reasonable inferences supporting the party opposing the motion." *Sanjuan v. IBP, Inc.*, 275 F.3d 1290, 1293 (10th Cir.2002). In determining whether judgment as a matter of law is proper, the court may not weigh the evidence, consider the credibility of witnesses, or substitute its judgment for that of the jury. *Turnbull v. Topeka State Hosp.*, 255 F.3d 1238, 1241 (10th Cir.2001).

In essence, the court must affirm the jury verdict if, viewing the record in the light most favorable to the nonmoving party, it contains evidence upon which the jury could have properly returned a verdict for the nonmoving party. *Roberts v. Progressive Independence, Inc.*, 183 F.3d 1215, 1219–20 (10th Cir.1999) (citing *Harolds Stores, Inc. v. Dillard Dep't Stores, Inc.*, 82 F.3d 1533, 1546 (10th Cir.1996)). Conversely, ·the court must enter judgment as a matter of law in favor of the moving party if "there is no legally sufficient evidentiary basis . . . with respect to a claim or defense . . . under the controlling law." *Deters v. Equifax Credit Information Servs., Inc.*, 202 F.3d 1262, 1268 (10th Cir.2000) (quoting *Harolds*, 82 F.3d at 1546–47).

### B. Motion for a new trial

■ A motion for a new trial made on the ground that the jury's verdict is against the weight of the evidence is committed to the sound discretion of the trial court. *Veile v. Martinson*, 258 F.3d 1180, 1188 (10th Cir.2001) (citing *Getter v. Wal-Mart Stores, Inc.*, 66 F.3d 1119, 1125 (10th Cir.1995)). The evidence is viewed in the light most favorable to the plaintiff. *Mac-*

*senti v. Becker*, 237 F.3d 1223, 1235 (10th Cir.2001). The "inquiry focuses on whether the verdict is clearly, decidedly or overwhelmingly against the weight of the evidence." *Veile*, 258 F.3d at 1188 (citing *Getter*, 66 F.3d at 1125). In assessing the propriety of granting a new trial, the court must bear in mind that "determining the weight to be given to the testimony, drawing inferences from the facts established, resolving conflicts in the evidence, and reaching ultimate conclusions of fact" are functions within the sole province of the jury. *Id.* at 1190–91 (quoting *Thunder Basin Coal Co. v. Southwestern Pub. Serv. Co.*, 104 F.3d 1205, 1212 (10th Cir.1997)).

■ A new trial based upon an erroneous evidentiary ruling is warranted only if that error prejudicially affected the substantial rights of a party. Fed.R.Civ.P. 61; *Hidalgo v. Fagen, Inc.*, 206 F.3d 1013, 1020 (10th Cir.2000). Evidence admitted in error is prejudicial only "if it can be reasonably concluded that with or without such evidence, there would have been a contrary result." *Sanjuan v. IBP, Inc.*, 160 F.3d 1291, 1296 (10th Cir.1998).

### II. Arguments made jointly by defendants in their motions [2]

Defendants argue in their motions that there was insufficient evidence for a reasonable jury to have found in plaintiff's favor on the claims for negligent failure to warn, fraudulent concealment and negligent testing and that plaintiff's claims for fraudulent concealment and negligent testing fail to state a claim under Kansas law. Defendants also argue that the evidence was overwhelming that plaintiff should have known by 1992 that he was addicted to smoking and that, therefore, no reasonable jury could have rejected the statute of

---

**2.** Each defendant filed its own motion for judgment as a matter of law or for a new trial. American, however, argued most of the issues by joining in the arguments made by Reynolds. Thus, the court will treat those arguments jointly here.

limitations defense. In the alternative, defendants argue that they should be granted a new trial because the court erred in its evidentiary rulings.

### A. Negligent failure to warn

With respect to plaintiff's failure to warn claim, defendants argue that the evidence presented at trial established that defendants' failure to warn Mr. Burton of the dangers of smoking did not cause Mr. Burton's addiction and peripheral vascular disease (PVD), that plaintiff was required to present expert testimony about the feasibility, adequacy and effectiveness of a proposed warning, that, had Mr. Burton heeded the federally mandated warnings, he would not have developed PVD, that plaintiff did not rebut the presumption that Reynolds issued sufficient warnings between January 1, 1966, and July 1, 1969, because of its compliance with federal law, that defendants did not have a duty to warn about the risk of developing PVD because it was not known prior to 1969 that smoking causes PVD, and that defendants did not have a duty to warn about the risk of addiction because the risk was well known before plaintiff started smoking in 1950.

### 1. Insufficient evidence of causation

▮ Defendants argue that the evidence presented at trial established that defendants' failure to warn Mr. Burton that smoking causes addiction and PVD did not cause plaintiff's injuries. Under Kansas law, a manufacturer's failure to provide an adequate warning creates a rebuttable presumption of causation. *Richter v. Limax Int'l, Inc.*, 45 F.3d 1464, 1471–72 (10th Cir.1995). Thus, the burden falls to defendants to rebut the presumption of causation.[3]

Defendants argue that the evidence presented at trial showed that no matter what warning was issued to Mr. Burton, he would have continued to smoke Camel cigarettes, become addicted and develop PVD. In support, defendants point to the cross-examination of Mr. Burton:

Q: Now, you were going to smoke cigarettes, Mr. Burton, no matter what anyone said because you liked them, correct?

A: Yes.

Plaintiff argues that Mr. Burton would never have started smoking if he had been warned about the dangers of addiction and PVD and points to Mr. Burton's statement made during direct examination:

Q: All right, Mr. Burton, let me take you back to when you were 14. If someone could have shown you this when you were 14, do you believe you would have ever started smoking?

A: No.

Plaintiff also points to testimony by Mr. Burton that he quit smoking after a doctor told him that he would lose his arms if he continued to smoke.

▮ Because of the presumption of causation under Kansas law, defendants are

---

**3.** Reynolds argues in its reply that in *Delaney v. Deere & Co.*, 268 Kan. 769, 999 P.2d 930 (2000) the Kansas Supreme Court declined "to adopt Comment J of the Restatement (Second) of Torts from which this presumption [of causation] emanates." In *Delaney*, the Kansas Supreme Court acknowledged that in *Wooderson v. Ortho Pharmaceutical Corp.*, 235 Kan. 387, 681 P.2d 1038 (1984), it relied on comment j in holding that where a warning is inadequate a presumption of cau-

sation arises. The court, however, "declin[ed] to adopt the portion of comment j which holds that a product bearing a warning which is safe for use if the warning is followed is not in a defective condition or unreasonably dangerous." *Id.* at 786, 999 P.2d at 942–43. The *Delaney* court did not reverse the *Wooderson* decision. Under Kansas law, there remains a presumption of causation where there is inadequate warning.

entitled to judgment as a matter of law only if they come forward with evidence rebutting the presumption of causation and the evidence regarding causation presented at trial "points but one way and is susceptible to no reasonable inferences supporting the party for whom the jury found." *Bielicki v. Terminix Int'l Co.*, 225 F.3d 1159, 1162 (10th Cir.2000). While defendants presented evidence relevant to causation on which a reasonable jury could have based a decision that the presumption of causation had been rebutted, the jury did not do that. For purposes of this motion, what is most pertinent is that the record contains evidence from which a reasonable jury could have concluded that defendants' failure to warn caused Mr. Burton to become addicted and develop PVD. Because there was evidence from which a reasonable jury could have concluded that, if defendants had warned Mr. Burton of the dangers of smoking, Mr. Burton would have never started smoking or would have stopped smoking, the court must uphold the jury's verdict.

Mr. Burton answered "no" to counsel's inquiry if he would have started smoking when he was 14 years old "if someone could have shown you this." Mr. Burton's answer, especially when placed in the context of his testimony, could have been understood by a reasonable jury to mean that he would not have started smoking if he knew that he could become addicted and develop a disease which leads to the loss of one's limbs, such as PVD. Mr. Burton also testified that he quit smoking after Dr. Koduri told him that he would lose his arms as well as his legs if he continued to smoke.[4] On cross examination, Mr. Burton testified that he enjoyed smoking ciga-

rettes and that when he started smoking he did not know that smoking caused health problems. Mr. Burton also testified that he had never heard that smoking could cause circulation problems and didn't believe his doctors when they first told him that smoking was the cause of his leg pain. From all of this evidence, a reasonable jury could have concluded that had defendants warned Mr. Burton that smoking causes addiction and PVD he would never have started smoking or would have stopped smoking.

Defendants focus on one answer to a leading question in cross-examination as a basis for granting judgment as a matter of law in their favor. After being questioned about addiction, counsel for Reynolds asked, "Now, you were going to smoke cigarettes, Mr. Burton, no matter what anyone said because you liked them, correct?" To this question, Mr. Burton answered "yes." Based on this answer, defendants argue that Mr. Burton would not have stopped smoking even if warned that smoking would cause him to be addicted and develop PVD. The court does not agree.

The court instructed the jury, as it does in all cases, that it did not have to accept the bald statements of a witness but was entitled to consider such factors as intelligence and demeanor while testifying in putting answers into context. The record established that Mr. Burton is not a well-educated man.[5] His answers were not precise and he had some difficulty communicating with the well-educated attorneys. Mr. Burton appeared to be easily manipulated by the attorneys, especially on cross-examination. He willingly accepted asser-

---

4. While Mr. Burton admitted that he started smoking again after his operation, Dr. Grunberg testified that it is difficult to quit smoking and that it often takes multiple attempts before a smoker quits successfully. A reasonable jury could have concluded that Dr. Ko-

duri's warning caused Mr. Burton to stop smoking.

5. Mr. Burton testified that he did not finish high school.

tions of fact made by the attorneys. For example, he often answered questions about prior incidents or testimony by simply accepting the assertion of the attorney, "If you say I did." Also, Mr. Burton often answered leading questions with a "yes" and did not attempt to clarify or explain. While a jury could have drawn the inference for which defendants argue, it was not required to have done so.

A reasonable jury could have understood Mr. Burton's answer to the question as simply meaning that he was going to smoke cigarettes because he liked them. A reasonable jury could have concluded that Mr. Burton did not mean that he would continue to smoke even if he was warned by defendants that smoking was addictive and causes PVD. In fact, he later testified that when a doctor explained that very fact, he stopped smoking. A reasonable jury could have also concluded that counsel "put one past him" by including the phrase "no matter what anyone said" and that Mr. Burton did not understand the question as being so broad as to include a warning about addiction and PVD. The jury saw Mr. Burton's demeanor when testifying and witnessed his emotion when responding to questions about whether he knew that smoking could cause him to become addicted and develop PVD. A reasonable jury could have concluded that Mr. Burton was horrified to learn that smoking could cause a person to lose his legs and believe that if defendants had told him this that he would have stopped smoking. The court will not take away the jury's verdict based on Mr. Burton's answer to a leading question which the court does not believe Mr. Burton must be deemed as a matter of law to have understood to be, as defendants now present the question, whether he would have continued smoking no matter what warning defendants gave him. Defendants were entitled to, and did, make that argument at trial. They did not succeed then and they are not entitled to succeed now.

Defendants also point to Mr. Burton's testimony that he did not read the warnings placed on cigarette packs and to the fact that Mr. Burton did not heed warnings from the public health community and Surgeon General and argue that no effective warning could have been given to Mr. Burton. The court does not agree. Mr. Burton's testimony that he did not read the carefully worded, legalistic warnings on cigarette packs may be evidence that a warning from the manufacturer placed on cigarette packs may not have been effective, but his testimony is not conclusive proof of the proposition that he would not have heeded a straightforward, candid warning from the manufacturer that it recognized the addictive nature of cigarettes and that smoking them causes serious diseases which can result in the loss of a person's legs and arms, diseases such as PVD. While Mr. Burton did not read the Surgeon General's warning, a reasonable jury could have concluded that a truly frank warning from the manufacturer that smoking was addictive and causes a disease with the consequences attendant to PVD is likely to have generated enough publicity to have caught Mr. Burton's attention. The jury certainly could have concluded that a specific warning issued by the manufacturer is significantly different from and more persuasive than a general warning mandated by the government.

A reasonable jury also could have concluded that an effective warning could have issued by means other than a written warning on cigarette packs. In fact, Mr. Burton testified that he remembered messages delivered through defendants' advertising. While the record contained testimony indicating that the public health community advised smokers to stop smoking, the testimony did not indicate what

means of communication were used and in what locations. In addition, the fact that Mr. Burton did not heed prior to 1969, the relevant time period, warnings from the Surgeon General and the public health community, warnings which the evidence indicated were not specific to addiction or PVD, is not conclusive proof that Mr. Burton would have ignored a warning from the manufacturer, especially one related to addiction and PVD. Based on the evidence presented at trial, a reasonable jury could have concluded, based on Mr. Burton's testimony and other evidence, that defendants could have conveyed an appropriate warning to Mr. Burton by some means and that their failure to do so caused Mr. Burton to become addicted and, ultimately, develop PVD.

Defendants argue that Mr. Burton did not heed warnings given to him by physicians and that this is proof that no effective warning could have been given by defendants. As the court has explained, a reasonable jury could have concluded, based on testimony by Mr. Burton and Dr. Grunberg, that Mr. Burton stopped smoking based on the warning he received from Dr. Koduri. While Mr. Burton testified that he did not believe his doctors at first, he also testified that he ultimately quit smoking and did so based upon Dr. Koduri's warning. While Mr. Burton admitted that he began smoking again after the amputation, Dr. Grunberg testified that Mr. Burton was addicted and that it often takes multiple attempts before an addicted smoker can successfully quit smoking. A reasonable jury could have concluded that Mr. Burton ultimately would have been successful at quitting smoking had he been warned that smoking was addictive and causes PVD.

### 2. Expert testimony about a proposed warning

Defendants argue that plaintiff was required to present expert testimony about a proposed warning and its feasibility, adequacy and effectiveness. Plaintiff responds by arguing that he was not required to propose a warning or provide expert testimony.[6] The court concludes that plaintiff was not required to present expert testimony about the feasibility, adequacy and effectiveness of a proposed warning.

In *Richter v. Limax International, Inc.*, 45 F.3d 1464, 1472 (10th Cir.1995), the Tenth Circuit rejected the argument that, under Kansas law, a plaintiff must suggest a proposed warning and that the plaintiff must testify that he or she would have heeded the warning. The Tenth Circuit held that "Kansas does not require such self-serving testimony from plaintiffs" and explained that the argument "entirely ignores that the effect of the presumption [of causation] is to place the burden on [defendant] to rebut it." In this case, defendants presented evidence sufficient for a reasonable jury to have concluded that the presumption of causation was rebutted. There is, however, also evidence in the record from which a reasonable jury could have concluded that warning Mr. Burton that smoking is addictive and causes PVD would have been effective. Mr. Burton's testimony, as explained above, could have been understood by a reasonable jury to mean that he would not have started smoking if he had known that he would become addicted and develop PVD. Implicit in Mr. Burton's testimony is a proposed warning that smoking causes addiction and PVD. Because there is evidence from which a reasonable jury could have decided the causation issue either way, relief

---

**6.** Plaintiff also points to evidence admitted at trial of the warning on all packages of ciga-

rettes manufactured by Liggett Group reading, "Warning: Smoking is Addictive."

under Rule 50 is not appropriate. *Bielicki,* 225 F.3d at 1162.

■ In support of their position that expert testimony is required, defendants cite *Meyerhoff v. Michelin Tire Corp.,* 852 F.Supp. 933 (D.Kan.1994) and *Duffee v. Murray Ohio Manufacturing Co.,* 879 F.Supp. 1078 (D.Kan.1995). The court concludes that both cases are distinguishable. In *Meyerhoff,* the district court held that a plaintiff must "do more than simply present an expert who espouses a new or different warning. He must establish the warning's feasibility, adequacy, and effectiveness." The only evidence in *Meyerhoff* about a warning came from expert testimony and the court held that the expert testimony failed to establish the warning's feasibility, adequacy, and effectiveness. In reviewing the district court's decision, the Tenth Circuit acknowledged that it may be possible to prove a failure to warn case without expert testimony but explained that "the Meyerhoffs chose to prove their case through expert testimony" and, because that testimony was inadequate, upheld the district court's decision granting defendant's Rule 50 motion. In *Duffee,* the plaintiff also proceeded by expert testimony that the district court held was inadequate. In both cases, there was insufficient evidence independent of expert testimony to prove the failure to warn claim. Such is not the case here where plaintiff chose to proceed without expert testimony.

In *Meyerhoff,* the Tenth Circuit noted that "the Kansas Supreme Court has suggested that expert testimony 'should be considered' in a failure to warn case." *Meyerhoff v. Michelin Tire Corp.,* 70 F.3d 1175, 1183 (10th Cir.1995). In support, the Tenth Circuit cited the Kansas Supreme Court decision in *Humes v. Clinton,* 246 Kan. 590, 792 P.2d 1032 (1990), where the Kansas Supreme Court pointed to the decision in *Graham v. Wyeth Laboratories,* 666 F.Supp. 1483 (D.Kan.1987), and noted that "the district court recognized that the adequacy of a warning was an issue for the jury and that the testimony of experts should be considered." The Kansas Supreme Court then explained that expert testimony indicated that the warning at issue was adequate and that no genuine issue of fact remained regarding whether the warning was adequate and upheld the order granting summary judgment. In sum, neither *Humes* nor *Meyerhoff* hold that a plaintiff must produce expert testimony to prevail on a failure to warn claim. That testimony of experts, when offered, "should be considered" does not amount to a requirement that expert testimony be presented. In its own research this court was unable to find authority in Kansas law supporting the notion that expert testimony is required. Defendants do not point the court to any such case law and the court, therefore, concludes that Kansas law does not require expert testimony to prevail on a failure to warn claim. In this case, Mr. Burton's testimony was sufficient to prove plaintiff's failure to warn claim.

### 3. Proximate causation

■ Defendants argue that had Mr. Burton heeded the post–1969 federally mandated warnings placed on cigarette packs, he would not have developed PVD. In fact, there was testimony from plaintiff's expert witnesses indicating that if Mr. Burton had stopped smoking when the warnings appeared, his risk of developing PVD would have been greatly reduced. The evidence also indicated, however, that these warnings did not say that smoking is addictive and causes PVD. In other words, defendants argue that if Mr. Burton had coincidentally or serendipitously stopped smoking because of warnings about diseases such as cancer he would not have contracted the disease he actually did.

The court rejects this argument for two reasons. First, it really appears to be a disguised comparative fault argument. Second, even on its own terms, the argument fails because the issue was one for the trier of fact.

■ Since adoption of comparative negligence in 1974, Kansas courts compare the percentages of fault of all alleged wrongdoers. *Reynolds v. Kansas Dept. of Transp.*, 43 P.3d 799, 804 (Kan. April 19, 2002) (citing K.S.A. 60–258a.). "With the adoption of comparative fault, Kansas has moved beyond the concept of proximate cause in negligence." *Id.* "In a comparative fault system, 'distinctions between primary, secondary, active and passive negligence lose their previous identities.' The nature of misconduct in such cases is to be expressed on the basis of degrees of comparative fault or causation, and the 'all or nothing' concepts are swept aside.'" *Id.* at 804–05 (citing *Kennedy v. City of Sawyer*, 228 Kan. 439, 618 P.2d 788, Syl. 6 (1980)). "A jury is instructed to 'weigh the respective contributions of the parties' in making the apportionment of percentage of fault." *Id.* at 805.

In this case, defendants were entitled to have the jury weigh plaintiff's fault as well as defendants but they waived this defense and agreed to instruct the jury without consideration of plaintiff's fault. The jury was instructed that "a party is at fault when he or she is negligent and that negligence caused or contributed to the event which brought about the injury or damages for which claim is made." Following these instructions, the jury concluded that Reynolds was 99% at fault and American was 1% at fault. Defendants may not, after receiving an unfavorable verdict, successfully argue that the jury should have assigned fault to plaintiff. The record contains evidence upon which the jury properly could have returned a verdict in favor of plaintiff and assigned fault to Reynolds at

99% and to American at 1%. As the court has explained, a reasonable jury could have concluded, based on the evidence presented at trial, that defendants were at fault for Mr. Burton becoming addicted and developing PVD because they did not warn Mr. Burton about these dangers. While the jury was also presented evidence indicating that the plaintiff was at fault, defendants waived this defense and agreed to instruct the jury to compare the fault of only Reynolds and American. Defendants are not entitled to judgment as a matter of law on the grounds that evidence indicating that plaintiff was also at fault was presented to the jury.

Moreover, the jury was not compelled to accept the cited testimony as conclusive. It was entitled to weigh all of the evidence and reach the conclusion that it did. Even though post-July 1, 1969, cigarette package warnings are deemed adequate as a matter of law and no claim can be predicated on them, that does not dictate the result that the causal chain is broken as a matter of law when a plaintiff can otherwise establish liability for pre–1969 acts or omissions.

4. Presumption related to warnings between 1966 and 1969

■ Defendants argue that plaintiff did not present evidence to rebut the presumption that defendants were not liable for failure to warn during the period from January 1, 1966, to July 1, 1969, because of their compliance with federal law. The jury was instructed that "[b]ecause the packages contained the warning ... defendants are not liable for failure to warn during the period of time, unless the plaintiff proves that a reasonably prudent manufacturer could and would have taken additional precautions." The record contains evidence from which a reasonable jury could have concluded that a reasonable

manufacturer would have made additional warnings during this period of time and, thus, the jury's verdict must be upheld.

Regarding addiction, Dr. Grunberg testified that his review of tobacco industry documents revealed that "there was knowledge that predated our knowledge that nicotine was addictive." Specifically, he testified that he discovered that the industry had knowledge about nicotine and addiction that predated that of the ˙public health community by 20 to 25 years. Dr. Grunberg testified that industry scientists not only did not reveal this information but were affirmatively misleading. Dr. Grunberg reviewed plaintiff's exhibit 109, dated April 14, 1972, and concluded that the document showed that defendants knew substantially more about the physiological effects of nicotine than the public health community in 1972 but did not disclose their knowledge. Dr. Grunberg pointed out that the document showed "knowledge of several aspects of the primary criteria" used to diagnose addiction.ˋ The document itself indicated that the industry is "based upon design, manufacture and sale of attractive dosage forms of nicotine," that "nicotine is both habituating and unique in its variety of physiological actions," and discusses "another aspect of our business; that is, the factors which induce a pre-smoker or non-smoker to become a habituated smoker."

Dr. Burns testified that in 1972, "there was considerable doubt at that point in time [within the public health community] whether the hold that cigarettes had on people—there's no question that cigarettes had a hold on people, but there was a question as to whether that hold was behavioral; that is, that you learned—become accustomed to using the cigarette ... or whether it was the nicotine pharmacologically acting through an addictive pathway that produced that hold." Plaintiff's exhibit 122, an analysis of the effects of the smoking controversy and the "safer" cigarette strategy on consumer behavior, dated September 19, 1969, indicates that one factor relating to the propensity to smoke is "the physiological habituation factor, assumed to be nicotine." According to the document, the factor "is believed to be relatively constant and large for confirmed smokers." For purposes of the discussion, the document asserts, it must be assumed that "nicotine, the physiological habituating factor in all tobacco products is a *sine qua non.*" Plaintiff's exhibit 228, dated March 28, 1972, indicates that "for the typical smoker, nicotine satisfaction is the dominant desire, as opposed to flavor and other satisfactions." Plaintiff's exhibit 8, admitted against American only, is dated May 14, 1940, and includes a discussion about research on the pharmacological effects of nicotine. A reasonable inference that American was hiding knowledge of the addictive nature of nicotine may be drawn from plaintiff's exhibit 256, dated May 14, 1969, which directs that in all future company documents nicotine should be referred to as "Compound W."

Cross-examination of Dr. Grunberg by Reynolds established that while there was no consensus in the public health community, evidence and literature suggesting that smoking was addictive existed prior to 1969. As plaintiff points out, under Kansas law, a manufacturer is considered an expert in its field and is under a continuous duty to keep abreast of scientific developments which may impact the safety of its products. *Wooderson v. Ortho Pharmaceutical Corp.*, 235 Kan. 387, 400, 681 P.2d 1038 (1984) (explaining that a "manufacturer's duty to warn is, therefore, commensurate not only with its actual knowledge gained from research and adverse reaction reports but also with its constructive knowledge as measured by scientific literature and other available

means of communication."). Based on all of this evidence, a reasonable jury could have concluded that, prior to July 1, 1969, Reynolds knew or had information suggesting that nicotine was addictive and that a reasonable manufacturer would have, in addition to providing the federally mandated warnings, warned its consumers that smoking is addictive.

Regarding the risk of developing PVD, Dr. Burns testified that the 1964 Surgeon General's report indicated that there was not sufficient evidence to say that smoking caused PVD but that "most experienced clinicians were recommending that people not smoke who had PVD." Plaintiff's exhibit 258, dated October 24, 1955, and admitted against American only, is a copy of a letter to the editor of the Journal of the American Medical Association from a physician reporting the results of his work on smoking filtered cigarettes and its impact on vascular disease. According to the letter, the physician had "repeatedly observed that relapse in [PVD] may occur when patients smoke the filtered cigarettes." One example is given where a patient "stopped smoking and his symptoms remained quiescent . . . until in 1949 when he started to smoke. Within six months gangrene of three toes developed. Once more an abstinence from smoking . . . and the man was free of symptoms." The letter reported that the man recently started smoking filtered cigarettes and "again his disease has been activated." While the document was admitted against only American, Dr. Burns testified that it was published in the Journal and, thus, its contents may be considered part of the body of scientific knowledge regarding smoking and PVD prior to 1969. Dr. Burns also testified that the vasoconstrictive effect of nicotine has been known since the 1930's and that there has been published literature dealing with a possible causal relationship between PVD and nicotine "for a long time." Plaintiff's

exhibit 16, dated June 17, 1960, indicates that "[i]t is a generally accepted fact that smoking in the basal state causes peripheral vasoconstriction and a lowering of temperature in the fingers and toes." As a manufacturer, Reynolds had a duty under Kansas law to warn of dangers associated with its product that it "knows, has reason to know, or should know, based upon its position as an expert in the field, upon its research, upon cases reported to it, and upon scientific development, research, and publications in the field." *Wooderson*, 235 Kan. at 409, 681 P.2d 1038. Based on this evidence, a reasonable jury could have concluded that, prior to July 1, 1969, Reynolds knew or had information suggesting that developing PVD is a risk of smoking and that a reasonable manufacturer would have, in addition to providing the federally mandated warnings, warned its consumers of the risk.

The court also upholds the verdict because the jury determined that defendants' failure to give plaintiff appropriate warnings prior to July 1, 1969 caused plaintiff's damages. The verdict was not limited to the time period of January 1, 1966 to July 1, 1969. Because evidence was presented from which a reasonable jury could have concluded·that defendants should have warned Mr. Burton prior to 1966 that smoking was addictive and causes PVD, the verdict must be upheld even if the presumption that the warnings between 1966 and 1969 were sufficient was not rebutted.

### 5. No duty to warn about PVD risk

Defendants point out that under Kansas law a manufacturer has a duty to warn of harmful effects of a product "that are known or are reasonably foreseeable in the state of the art" and argues that there was insufficient evidence for a reasonable

jury to have concluded that PVD was a known or foreseeable risk prior to July 1, 1969. Specifically, Reynolds points to testimony from plaintiff's expert witnesses indicating that the public health community was not able to conclude that smoking caused PVD prior to the early 1970's. For example, Dr. Burns testified that there was insufficient evidence prior to 1970 for the Surgeon General to reach the conclusion that smoking causes PVD. Nonetheless, the record contains sufficient evidence, as set out above, for a reasonable jury to have concluded that prior to July 1, 1969, there was sufficient evidence indicating that PVD was a risk of smoking or, at least, that the risk was foreseeable to a manufacturer such that it would have a duty to warn.

The 1964 Surgeon General's report, while not making a causal judgment, raised the concern about smoking and PVD and said that most doctors are recommending that patients with PVD do not smoke. The letter to the editor of the Journal of the American Medical Association presented empirical evidence of the link between smoking and PVD. Defendants did not attempt to rebut this empirical evidence or offer an explanation of why the evidence would not cause a reasonable manufacturer to warn of the risk. The evidence indicated that it was known that nicotine was a vasoconstricter and plaintiff's exhibit 16 showed that defendants had confirmed that smoking "causes peripheral vasoconstriction and a lowering of temperature in the fingers and toes." Whether the evidence was not conclusive enough to cause the public health community to make a definitive causal link, then, really is not the point. Based on this evidence, a reasonable jury could have concluded that prior to July 1, 1969, there was sufficient evidence showing that PVD was a known risk of smoking or that it was a foreseeable risk.

■ Moreover, the law in Kansas does not limit the duty of a manufacturer to warn only of risks where there is a consensus about a causal relationship. In *Wooderson*, the Kansas Supreme court quoted with approval the Ohio Supreme Court decision in *Seley v. G.D. Searle & Co.*, 67 Ohio St.2d 192, 423 N.E.2d 831 (1981):

A jury may find that a warning is inadequate and unreasonable even where the existence of a "risk," i.e., a casual relationship between the use of the product and the resulting injury, *has not been definitely established.* Thus, where scientific or medical evidence exists tending to show that a certain danger is associated with the used of the drug, the manufacturer may not ignore or discount that information in drafting its warning solely because it finds it to be unconvincing.

*Wooderson*, 235 Kan. at 406, 681 P.2d at 1054 (quoting *Seley*, 67 Ohio St.2d at 198, 423 N.E.2d at 837) (italics in original) (citations omitted). The Kansas Supreme Court concluded that "[w]e agree with the *McEwen [v. Ortho Pharmaceutical Corp.*, 270 Or. 375, 528 P.2d 522 (1974)] and *Seley* courts" and held that because "available scientific literature clearly tended to show that there was a danger of HUS, malignant hypertension and acute kidney failure attendant to the use of [defendant's] drug" the defendant knew or should have known of the risk and issued a warning. In *Richter*, 45 F.3d at 1468, the Tenth Circuit recognized that this duty is not limited to ethical drug companies but is a general principle of Kansas product liability law. In this case, there was sufficient evidence for a reasonable jury to have concluded that Reynolds knew or should have known that PVD was a risk of smoking, or at least was a foreseeable risk of smoking, despite testimony that a scientific consensus had not yet been reached on a causal relationship.

## 6. No duty to warn about addiction risk

█ Defendants point out that a manufacturer does not have a duty to warn of open and obvious hazards and argues that the evidence presented at trial showed that the fact that smoking was addictive was "well known long before 1950." The court does not agree. There was ample evidence from which a reasonable jury could have concluded that the fact that smoking was addictive was not open and obvious. Dr. Burns testified that, in 1972, while it was well known that smoking cigarettes "had a hold on people," it was not established that the nicotine in smoke was "pharmacologically acting through an addictive pathway that produced that hold." Dr. Grunberg discussed the criteria for diagnosing addiction and testified that prior to the 1988 Surgeon General's report there was not a scientific or medical consensus that nicotine met the criteria for addiction. Based on this and other evidence, a reasonable jury could have concluded that the fact that smoking was addictive was not open and obvious when Mr. Burton started smoking in 1950.

### B. Fraudulent concealment

With respect to plaintiff's fraudulent concealment claim, defendants argue that there was insufficient evidence showing that defendants' concealment caused Mr. Burton's addiction or PVD, that there was no evidence showing that Mr. Burton relied on defendants to provide him with information about addiction and PVD, that there was insufficient evidence that defendants could have effectively communicated information to Mr. Burton, there was no evidence from which to conclude that Mr. Burton could not have discovered by exercising reasonable diligence that smoking is addictive and causes PVD, that there was insufficient evidence that defendants concealed information about PVD or addiction prior to 1969, that plaintiff's claim of fraudulent concealment is preempted to

the extent that it is based on actions or lack of actions after July 1, 1969, that there was insufficient evidence that defendants concealed information about PVD or addiction after 1969, and that a fraudulent concealment claim in a products liability case in Kansas is the same as a failure to warn claim.

### 1. Insufficient evidence of causation

Defendants again point to the "admission" of Mr. Burton on cross-examination that he was "going to smoke no matter whatever anyone said" and argue that defendants' concealment did not cause Mr. Burton's injuries. The court rejects the argument for the reasons it rejected defendants' argument in connection with the failure to warn claim. The court also rejects, for the reasons set out previously, the argument that because Mr. Burton did not heed other warnings that he would not have heeded frank and honest disclosures by the defendants.

### 2. Insufficient evidence of reliance

Defendants argue that there was insufficient evidence on which a reasonable jury could have concluded that Mr. Burton reasonably relied on defendants to warn him that smoking is addictive and causes PVD. Defendants point to Mr. Burton's testimony that he generally did not read newspapers or magazines, did not read the warnings placed on cigarette packs or the Surgeon General's reports and did not see a doctor because he was never sick and argue that because Mr. Burton "avoided all information available through every possible medium and from every possible source, it was beyond reason to infer that Mr. Burton relied on defendants or anyone else for information concerning the potential risks associated with smoking." In the opinion of the court, defendants grossly mischaracterize plaintiff's

testimony. Mr. Burton did not testify that he intentionally closed his eyes and ears to information about the dangers of smoking. His testimony does not preclude a reasonable jury from having concluded that Mr. Burton relied on defendants to reveal that smoking cigarettes is addictive and causes PVD. A reasonable jury could have concluded that Mr. Burton was receptive to such information, especially given his emotional testimony that he would never have started smoking if he had known that smoking could cause him to lose his legs, and that the testimony highlighted by defendants did not mean that Mr. Burton intentionally avoided all information about the harmful effects of smoking.

■■■ The court believes that there was sufficient evidence in the record from which a reasonable jury could have inferred that Mr. Burton reasonably relied on defendants to reveal that smoking is addictive and causes PVD. Mr. Burton testified that he enjoyed smoking cigarettes and Dr. Grunberg testified that Mr. Burton was addicted to the nicotine in cigarettes. The evidence also showed that Mr. Burton did not heed the general warnings that smoking was harmful issued by the Surgeon General and public health community. A reasonable jury could have inferred that Mr. Burton would not stop smoking absent disclosures specific to addiction and PVD issued by the manufacturers of the cigarettes he smoked and, thus, that he relied on the manufacturers to reveal that smoking was addictive and causes PVD. The jury could have inferred from his very love of smoking, from his probable addiction to smoking, and from their common experience that, while he did not want to pay attention to nagging outsiders who might criticize his beloved activity, he would have been receptive to a cautionary message from those in whom he placed his implicit trust by eagerly consuming their products.

In addition, the record contained evidence showing that Reynolds and American, acting on their own and through certain agents and co-conspirators, represented to the public that they would take it upon themselves to investigate and determine whether there were health consequences of smoking.[7] The evidence showed that despite clear indications that smoking was harmful, defendants engaged in a publicity campaign telling the public that whether there were negative health consequences from smoking remains an "open question." Based on this evidence, a reasonable jury could have concluded that the public, including Mr. Burton, were induced to rely and did rely on the defendants to reveal the health consequences of smoking.

### 3. Insufficient evidence of ability to deliver message

■■■ Defendants again argue that "Mr. Burton's own testimony established that

---

7. Prior to trial, the court made a finding under Federal Rule of Evidence 801(d)(2)(E) that American, Reynolds and the other entities listed on plaintiff's exhibit 198 entered into a conspiracy to conceal the health effects of smoking from the public. Thus, certain statements were received into evidence against the defendants under the co-conspirator exception to the definition of hearsay. While Mr. Burton testified that he did not read plaintiff's exhibit 198, the evidence indicated that the co-conspirators communicated their pledge to determine whether smoking had negative health consequences to the public by numerous means. A reasonable jury could have concluded that Mr. Burton was exposed to that message directly or indirectly and relied upon the companies' commitment. Mr. Burton testified that he remembered advertising messages of Reynolds. This fact alone is a basis for a reasonable jury to have inferred that Reynolds was able to successfully communicate messages to Mr. Burton.

there was no way for defendants to communicate any information about addiction and PVD to him, so that any failure to disclose this information did not cause his injuries." Defendants point to Mr. Burton's testimony that he did not generally read newspapers or magazines, did not see a doctor before 1993, did not read the warnings on cigarette packs and did not read the Surgeon General's report. The court rejects the argument for the same reasons that it rejected the argument in connection with plaintiff's failure to warn claim. While Mr. Burton did not read the Surgeon General's warning on cigarette packs, a reasonable jury could have concluded that a candid cautionary message from the manufacturer, especially if it indicated that smoking was addictive and causes PVD, would have generated enough publicity to catch Mr. Burton's attention. The same could have been inferred about statements issued in newspapers or magazines or through the electronic media. Mr. Burton may not have been a frequent reader or visited a physician for regular physicals, but the jury could have inferred that a disclosure from the manufacturer disseminated through the news media or given to the public health community would have created sufficient publicity to get the message to Mr. Burton. In fact, Mr. Burton testified that he remembered messages delivered through defendants' advertising. Based on the evidence presented at trial, a reasonable jury could have concluded, based on Mr. Burton's testimony and other evidence, that defendants could have provided appropriate disclosures to Mr. Burton by some means and that its failure to do so caused Mr. Burton to become addicted and, ultimately, develop PVD.

### 4. Reasonable diligence

The jury was instructed that in order for plaintiff to prevail on the claim of fraudulent concealment, it must find that "[d]efendants had knowledge of material facts about addiction and PVD that the plaintiff did not have and which he could not have discovered by the exercise of reasonable diligence." Defendants argue that judgment as a matter of law should be granted to defendants because the record lacks evidence showing that Mr. Burton "could not have discovered material facts about addiction and PVD through the exercise of reasonable diligence." Specifically, defendants argue that plaintiff did not show that Mr. Burton "ever attempted to ascertain any information about the health effects of smoking during the 43 years that he smoked" and that Mr. Burton ignored the public health community's warnings about smoking, including warnings issued by the Surgeon General linking smoking to PVD and addiction. The court concludes that there was sufficient evidence in the record from which a reasonable jury could have concluded that Mr. Burton could not have discovered that smoking causes addiction and PVD through the exercise of reasonable diligence.

While the public health community was aware of evidence linking smoking and PVD as of the early 1970s and was made aware that smoking was addictive by the 1988 Surgeon General's report, the evidence indicated that defendants hampered the efforts of the public health community to communicate this information to the public. Dr. Burns testified that a decline in smoking rates ended in 1954 when the industry began its "open question" campaign. Dr. Burns also testified that the Council on Tobacco Research ("CTR"), a group established by defendants and others in the industry, told the public that it would hire leading scientists to do objective research and determine whether there are negative health consequences from smoking but, in fact, the scientists carried out the public relations mission of the tobacco industry by maintaining that wheth-

er there were negative health consequences from smoking remained an "open question." Dr. Burns explained that the efforts of CTR hindered the public health community's attempt to educate the public by creating "doubt and confusion in the public's mind about the relationship" between smoking and disease. Dr. Burns also testified that the industry's demand for "mechanistic" proof that smoking causes disease was "misdirection" that "both distracted and interfered with the effort by the public health community to make a very clear statement to the public about the risk associated with cigarette smoke." Based on this evidence and other similar evidence presented at trial, a reasonable jury could have concluded that the efforts of defendants and their co-conspirators would have prevented Mr. Burton, or any member of the public, from recognizing that smoking is addictive and causes PVD, despite reasonable diligence.

Even absent a conclusion that defendants prevented discovery of information about the harms of smoking, there was sufficient evidence to support the jury's verdict. Mr. Burton testified that he began smoking in 1950. The evidence indicated that defendants concealed proof that smoking was addictive and that, as a result, the public health community did not conclude that smoking was addictive until 1988. Plaintiff's experts testified that it was not until 1970 that the public health community was aware that smoking causes PVD. Because the evidence indicated that by the time that the public health community knew that smoking causes PVD, Mr. Burton had already been smoking for 20 years, and by the time of the 1988 Surgeon General's report on smoking and addiction, Mr. Burton had been smoking for 38

years, a reasonable jury could have concluded that even if Mr. Burton could have discovered by exercising reasonable diligence that smoking was addictive and causes PVD, he could only have done so after he was already addicted and had damage to the arteries in his legs.

5. Insufficient evidence of concealment prior to 1969

██ Defendants argue that there is no evidence that it concealed information showing that smoking causes addiction or PVD prior to 1969.[8] The court disagrees. As the court pointed out in connection with plaintiff's failure to warn claim, there was sufficient evidence in the record to have concluded that defendants knew that smoking was addictive prior to 1969 but did not disclose this information to the public. Dr. Grunberg's testimony established that defendants possessed knowledge that predated that of the public health community by as much as 20 to 25 years and that industry scientists not only did not reveal this information but were affirmatively misleading. In addition, Dr. Grunberg testified that the public health community was not able to reach a consensus that smoking was addictive until 1988. A reasonable jury could also have concluded that defendants possessed evidence that smoking was addictive prior to 1969 but did not reveal it on the basis of plaintiff's exhibits, discussed in detail in the court's analysis of plaintiff's failure to warn claim.

With respect to the fact that smoking causes PVD, the record did not contain such clear-cut evidence indicating that defendants had knowledge that the public health community did not have. Such an inference was available from the evidence,

---

8. The court notes that because the jury's verdict on the fraudulent concealment claim was not limited to actions taken prior to 1969, the lack of evidence of concealment prior to 1969 is only significant if there is also a lack of evidence of concealment post 1969 or a claim of fraudulent concealment post 1969 is barred.

however. Moreover, a reasonable jury could have concluded that defendants fraudulently concealed information about PVD by engaging in a campaign to cast doubt on the fact that smoking is harmful without any valid scientific basis for doing so. The evidence showed that prior to 1970 evidence existed showing that developing PVD was a risk of smoking and that in 1970 there was enough evidence for the public health community to decide that smoking causes PVD. The evidence also indicated, however, that, beginning in 1954, and continuing through at least the 1980s, defendants operated a public relations campaign which delivered the message to the public that whether smoking causes health problems remains an "open question." Dr. Burns testified that this "open question" campaign interfered with the ability of the public health community to effectively communicate to the public that smoking causes health problems. The evidence also indicated that part of this strategy was the creation of the CTR and the use of the CTR to fund studies with the objective of creating the impression that there was still an open controversy about whether smoking causes health problems. A reasonable jury could have concluded that this campaign, in which defendants participated, hindered Mr. Burton and others from understanding that smoking is harmful to health and, specifically, that it causes PVD. Such a jury could have concluded that the campaign hindered the public's understanding of the risk of developing PVD both before and after 1969.[9]

### 6. Preemption

Defendants "reassert" their argument that the fraudulent concealment claim is barred to the extent that it is based on actions taken after July 1, 1969, arguing

that the claim is preempted under the Labeling Act and *Cipollone v. Liggett Group, Inc.*, 505 U.S. 504, 112 S.Ct. 2608, 120 L.Ed.2d 407 (1992). The court rejects this argument for the reason it was rejected in the court's March 10, 1995 order (Doc. 68), that is, because *Cipollone* distinguished claims that a manufacturer should have included additional warnings from claims of fraudulent misrepresentation and conspiracy and held that the latter claims are not barred because "such claims are not predicated on a duty 'based on smoking and health' but rather on a more general obligation—the duty not to deceive." Here, the evidence which supports plaintiff's fraudulent concealment claim is based on defendant's deception through the creation and manipulation of the CTR and its "open question" campaign to create a controversy where no valid controversy existed.

### 7. Insufficient evidence of concealment after 1969

Defendants argue that there was insufficient evidence for a reasonable jury to have concluded that they fraudulently concealed after 1969 the fact that smoking is addictive and causes PVD. The court disagrees. As the court explained above, the record contained evidence showing that Reynolds engaged in misdirection and the creation of doubt where none existed and that this action constituted fraudulent concealment of the fact that smoking is harmful, including that it is addictive and causes PVD. A reasonable jury could have reached the conclusion that defendants engaged in this fraudulent concealment both before and after 1969. Moreover, the evidence after 1969 does provide a basis for a reasonable jury to have inferred that de-

9. As explained in connection with the court's analysis of plaintiff's failure to warn, there was evidence in the record indicating that,

prior to 1969, smoking risked developing PVD.

fendants possessed knowledge of the causal relationship between smoking and PVD that they did not reveal. With respect to addiction, the record also contained evidence from which a reasonable jury could have reached the additional conclusion that after 1969, defendants knew that smoking was addictive but did not reveal it to the public health community.

8. Failure to state a claim under Kansas law

Defendants reassert their argument that, with respect to products liability law in Kansas, a fraudulent concealment claim is the same as a failure to warn claim. The court rejected this argument in its February 12, 1996, Memorandum and Order (Doc. 207) and it does so again now for the reasons set out in that order. The evidence at trial showed that defendants took affirmative actions in order to conceal the negative health effects of smoking. Also, the evidence presented would allow a reasonable jury to have concluded that defendants could have revealed that smoking is addictive and causes PVD by means other than issuing a warning. For example, Dr. Burns and Dr. Grunberg testified that defendants were asked to turn over relevant scientific findings to the Surgeon General for consideration in writing the relevant Surgeon General's reports.

C. Negligent failure to test

Defendants argue that it was error to submit plaintiff's negligent failure to test claim to the jury because the claim is not an independent tort under Kansas law. The court has reviewed the relevant case law and concludes that a plaintiff may properly bring a negligence claim based on the breach of a manufacturer's duty to test as an independent tort.

■ Kansas law recognizes a manufacturer's duty to test. *Lindquist v. Ayerst Laboratories, Inc.*, 227 Kan. 308, 607 P.2d

1339 (1980) (quoting 1 Hursch and Bailey, American Law of Products Liability 2d § 2:29 (1974)):

> The rule is that a manufacturer has a duty to make such tests and inspections, during and after the process of manufacture, as should be recognized as being reasonably necessary to secure the production of a safe product; and a manufacturer who negligently fails to use reasonable care in making such tests and inspections, and thereby produces a defective article which causes damage while being put to an ordinary, anticipated use, is liable for such damage.

*Lindquist v. Ayerst Labs., Inc.*, 227 Kan. 308, 319–20, 607 P.2d 1339 (1980). In *Lindquist*, plaintiff brought a wrongful death claim against the manufacturer of an anesthetic which allegedly caused the death of plaintiff's husband following surgery. Plaintiff's claim of design defect was submitted to the jury and, on appeal, plaintiff argued that the jury should also have been instructed on her theory of negligent failure to test. The court disagreed but not because it declined to recognize such a tort. It held that plaintiff had not presented sufficient evidence to show that additional tests would have been effective. There is no indication in *Lindquist*, which recognized a manufacturer's duty to test, that negligence based on failure to test is anything other than a tort which may be brought independently of a design defect claim or failure to warn claim. The court did not hold that because the jury had been instructed on a design defect claim that it would be redundant or otherwise inappropriate to instruct the jury on a negligent testing claim.

Defendants, in arguing that "[t]here is no authority under Kansas law to support plaintiff's negligent testing theory as an independent tort," cite *Lindquist* and two Tenth Circuit decisions. As explained, the court finds no support for defendants' position in *Lindquist*. In *Kinser v. Gehl Co.*,

184 F.3d 1259, 1273 (10th Cir.1999), the defendant argued that the court erred in submitting an instruction to the jury on breach of the duty to test. The Tenth Circuit quoted *Lindquist* and disagreed, noting: "Plaintiff advanced sufficient evidence suggesting that, if Gehl had evaluated the efficacy of warnings on its 1870 baler or examined closed-throat baler feed intake entanglement injuries in the industry, the company would have learned of the excessive dangers posed by the 1870 baler's design and the availability of ameliorative devices." It is important to note that, in *Kinser*, the jury also was instructed on a claim for design defect. The Tenth Circuit did not hold that it was inappropriate to instruct the jury on the negligent testing claim also. In *Richter v. Limax Int'l, Inc.*, 45 F.3d 1464, 1469–70 (10th Cir.1995), the Tenth Circuit discussed the duty to test in a case where the only claim in issue was negligence based on failure to warn. The court does not find support in these two cases for the proposition that no independent claim may be brought based on a manufacturer's breach of a duty to test.[10] In fact, the court believes that the *Kinser* opinion, like *Lindquist*, supports the court's decision to instruct the jury on plaintiff's negligent testing claim.

▆ Following *Lindquist* and *Kinser*, a jury properly may be instructed on negligent testing where the evidence shows that the manufacturer failed to make tests that it should have recognized as being reasonably necessary to secure the production of a safe product and thereby produced a defective product which causes damage while being put to an ordinary, anticipated use and the evidence shows that additional testing would have been effective. The court believes that such evidence exists in the record. Evidence was presented to the jury showing that defendants were aware that smoking cigarettes has significant negative health consequences, including to the vascular system, and that it is addictive. Evidence was also presented showing that defendants chose not to pursue a "safe cigarette" because they were afraid that the pursuit of such a cigarette would be seen as an admission that smoking cigarettes was harmful, contrary to their "open question" campaign. The evidence showed that a safe or safer cigarette was feasible to produce, including testimony about test products actually developed by defendants and other manufacturers. There was evidence presented that showed that defendants, as part of the CTR, directed research dollars away from studies to identify and learn about the harmful health effects of smoking and towards studies that would cast doubt on whether fears about smoking were valid.

A reasonable jury could have concluded, based on this and other evidence, that defendants should have realized that additional tests were necessary to identify and understand the negative health effects of

---

**10.** The fact that neither *Linquist* nor *Kisner* indicated that it would be inappropriate to instruct both on design defect and negligent testing undercuts defendants' argument that a negligent testing claim is subsumed by design defect or failure to warn claims. Defendants point to no authority interpreting Kansas law as such. Following *Lindquist* and *Kinser,* the court rejects defendants' argument. In addition, the court does not believe that a claim for negligent testing is necessarily subsumed by a negligent failure to warn or design defect claim because, like this case, it is possible that proper testing would yield a result that prevents plaintiff's injuries other than a warning or the correction of a design defect. In this case, a jury could have found that proper testing would yield a safe or safer cigarette or knowledge of how to prevent or cure the health hazards of smoking. Such a result does not necessarily require a finding that defendants were liable for design defects in their current products.

smoking, including its effects on the vascular system and the nature and extent of its addictiveness, and to develop a safe or safer cigarette. As a result, a reasonable jury could have further concluded that defendants manufactured cigarettes that were harmful when smoked as intended and that additional testing would have produced a safe or safer product. Because this evidence was in the record, it was proper to instruct the jury on plaintiff's negligent testing claim.

Defendants also argue that judgment as a matter of law should be entered in favor of defendants on this claim because plaintiff did not identify "what tests should have been performed, what such tests would have revealed, or what effect, if any, they would have had on Mr. Burton's injuries." In support, defendants point to *Lindquist*. The court in *Lindquist* did not hold that specific tests must be identified or details about specific tests must be in evidence. Instead, the court held that there must be evidence in the record showing that additional testing would have been effective. As the court has already explained, there was evidence in the record from which a reasonable jury could have concluded that additional testing would be effective. Evidence showed that testing had revealed the negative health effects of smoking and that further research by the public health community yielded a better understanding of the health consequences of smoking. There was also evidence in the record showing that additional testing aimed at eliminating the harmful health consequences of smoking would have been effective. Dr. Burns testified about experimental "safe" cigarettes that had been produced and defendants admitted that it had developed and tested safe or safer cigarettes but had not marketed them. In fact, as impeachment evidence, plaintiff admitted evidence showing that defendants had recently tested a "tobaccoless cigarette." The evidence showed that defendants and the rest of the tobacco industry intentionally delayed the research and development of these cigarettes for fear that it would constitute an admission that smoking cigarettes was harmful. Evidence showed that research aimed at reducing the risks of smoking was not performed for the same reason. A reasonable jury could have inferred, based on this evidence, that testing and research would have led long ago to the development of a safe or safer cigarette as concerns the very constituents of tobacco smoke which led to Mr. Burton's injuries here, such as nicotine and what is referred to as "tar," if defendants had fulfilled their duty to test. A reasonable jury could also have concluded that had defendants fulfilled their duty, a better understanding of the harmful effects of smoking would have been achieved, including, as Dr. Burns suggested, identification of the harms and an understanding of how to prevent and treat them.

### D. Statute of limitations

Defendants argue that the evidence presented at trial "was overwhelming that Mr. Burton should have known by May 25, 1992, that he was allegedly addicted to smoking." The jury was instructed, pursuant to Kansas law, that plaintiff's addiction claim must have been filed within two years of the date that he discovered his addiction to smoking. According to the instruction, if plaintiff either knew or could have reasonably ascertained that he was addicted to smoking sometime before May 25, 1992, his claims based on addiction were barred.[11]

The court believes that there was sufficient evidence in the record for a reason-

---

11. K.S.A. § 60–513(b) (2000 Supp.) provides:

Except as provided in subsections (c) and (d), the causes of action listed in subsection (a)

able jury to have concluded that Mr. Burton did not know by May 25, 1992, that he was addicted to smoking. Mr. Burton testified that he "didn't know a thing about addiction" but that he now believes that he was addicted based on "[w]hat I've heard and [what] the doctors have told me now." The evidence in this case indicated that Mr. Burton did not have contact with doctors until 1993 when he became concerned about his legs. A reasonable jury could have believed Mr. Burton and understood his testimony to mean that he did not know that he was addicted to smoking until doctors told him about his addiction in 1993.

In support of their argument that Mr. Burton could have reasonably ascertained that he was addicted to smoking prior to May 25, 1992, defendants point to evidence showing that the 1988 Surgeon General's report concluded that smoking was addictive and Dr. Grunberg's testimony that the addictive nature of cigarettes was communicated to the public in connection with the report. Defendants could not point to evidence that this information was put in front of Mr. Burton such that a reasonable person would recognize that smoking was addictive. There simply were no details about this effort to communicate the information to the public.

The court believes that there is evidence in the record from which a reasonable jury could have concluded that, prior to May 25, 1992, Mr. Burton had no reason to investigate whether he was addicted to smoking and, thus, the fact that Mr. Burton was addicted to smoking was not reasonably ascertainable prior to that date.[12] Mr. Burton testified that he smoked because he liked the flavor and enjoyed smoking. There was no evidence that Mr. Burton had any indication that he had a problem with addiction. Mr. Burton did not attempt to quit smoking prior to May 25, 1992. Because of this, Mr. Burton would have had no reason to know that it would be difficult for him to stop smoking if he wanted to stop. Defendants previously highlighted Mr. Burton's testimony that he didn't regularly read newspapers or magazines and was not aware of the Surgeon General's reports. Defendants have not pointed to any evidence indicating that Mr. Burton was exposed to information about the 1988 Surgeon General's report or to other evidence that smoking was addictive. Because there was no evidence indicating that Mr. Burton should have been aware that smoking was addictive or that he was addicted to smoking, a reasonable jury certainly could have concluded that Mr. Burton had no reason to investigate whether he was addicted to smoking prior to May 25, 1992, thus, the fact that he was addicted was not reasonably ascertainable.

E. Evidentiary errors

Defendants argue that the court erred in making various evidentiary rulings. The

---

shall not be deemed to have accrued until the act giving rise to the action first causes substantial injury, or, if the fact of injury is not reasonably ascertainable until some time after the initial act, then the period of limitation shall not commence until the fact of injury becomes reasonably ascertainable to the injured party, but in no event shall an action be commenced more than 10 years beyond the time of the act giving rise to the cause of action.

**12.** In *Davidson v. Denning*, 259 Kan. 659, 669, 914 P.2d 936 (1996), the Kansas Su-

preme Court held that the phrase "reasonably ascertainable" in § 60–513 "suggests an objective standard based upon an examination of the surrounding circumstances." In support, the court cited a decision by the Michigan Supreme Court, *Moll v. Abbott Laboratories*, 444 Mich. 1, 506 N.W.2d 816 (1993), applying the discovery rule and concluding that the inquiry is whether a plaintiff knew, a subjective test, or should have known, an objective test, of the injury.

court reaffirms its previous rulings for the reasons which it stated when those rulings were made. The arguments advanced by the defendants in their motions are a mere rehash of arguments previously made and rejected by the court either in written rulings or on the record at trial. By and large, those reasons need no further elaboration here and are hereby incorporated in this memorandum and order.

 There are two topics on which the court will touch briefly, however. First is the evidence admitted concerning other diseases and the evidence admitted concerning certain advertising and marketing practices or other public statements. These were admitted subject to appropriate limiting instructions primarily for the purpose of shedding light on the defendants' intent and state of mind. Plaintiff took on the burden of attempting to prove that the defendants fraudulently concealed vital information and that they also conspired with others to do so. Instruction No. 18 informed the jury that it was plaintiff's burden to prove by clear and convincing evidence that "[d]efendants intentionally failed to communicate" material facts about addiction and PVD to the plaintiff. Instruction No. 19 informed the jury that it was plaintiff's burden to prove that the defendants and others "had a meeting of the minds" to deprive the public of medical and scientific data in this respect. Perhaps not surprisingly, there was not a great deal of direct evidence on these points. The plaintiff was compelled to rely on circumstantial evidence, and the jury was entitled to draw appropriate inferences on these subjects from the totality of defendants' conduct and statements. Defendants' focus is far too narrow. Of course, the case was not about whether they misled the public about cancer. But, it was about whether they intended to

mislead, and conspired to mislead, about addiction and PVD. and they were entitled to be judged according to an accurate depiction of what the evidence revealed about their intentions and agreements.

 Ironically, perhaps, the defendants' arguments that this evidence was so overwhelming as to be unfairly prejudicial is easily refuted by the very fact that the jury demonstrated its ability to pick and choose. For example, it did not find against the defendants on all counts. In fact, on the two claims as to which the evidence in question was relevant, fraudulent concealment and conspiracy, it only found against the defendants on the former, finding that they intended to suppress material facts but not determining that they had conspired. Furthermore, the jury awarded punitive damages only against Reynolds and not against American. The jury, lastly, did not award an inflated sum for compensatory damages, which might have revealed that the defendants were unfairly prejudiced. The jury reviewed the evidence and drew inferences and reached conclusions which were well justified by the record.

 The second topic is the Gallup poll and the lab reports. There the defendants simply miss the point. The court did not rule that the polling data was hearsay. The data was just not offered in an admissible form. There were two layers of hearsay to be considered and the evidence failed to pass muster as to the statement made by the out-of-court declarant that the Gallup records actually said what defendants claimed they did.[13] As to the lab reports, it is ludicrous to contend that the jury should have been permitted to make what it might of lab reports of plaintiff's glucose levels and the like. Without testi-

---

13. Moreover, any error as to not admitting this evidence was clearly harmless. The evi-

dence had minimal probative value on the issues pertinent to the case.

mony from an expert to explain their significance, these records would have invited the jury to rank speculation. If these records did establish what defendants argue they did, that plaintiff's PVD was the result of diabetes, their failure after all the years this lawsuit has consumed to come forward with one witness to so testify from those reports or otherwise, is truly inexplicable.

### F. Compromise verdict

 Defendants argue that the verdict was a "compromise verdict" and that, therefore, they are entitled to a new trial. "A compromise verdict is one in which 'the jury, unable to agree on liability, compromises that disagreement and enters a low award of damages.'" *Shugart v. Central Rural Elec. Co-op.*, 110 F.3d 1501, 1505 (10th Cir.1997). "To determine whether a verdict is the result of jury compromise, we look to several factors. In particular, a damages award that is grossly inadequate, a close question of liability, and an odd chronology of jury deliberations are all indicia of a compromise verdict." *Skinner v. Total Petroleum, Inc.*, 859 F.2d 1439, 1445–46 (10th Cir.1988). Defendants point to the fact that the jury asked questions, including whether they had authority to adjust compensatory damages to any level they felt was appropriate, argue that because the jury asked questions related to liability shortly before arriving at a verdict that they must have come to a compromise verdict and argue that the decision to not award any noneconomic damages signaled a compromise verdict. The court believes that the only way to conclude that the jury reached a compromise verdict is to engage in pure conjecture and the court declines to grant a new trial on that basis.

The court agrees that the jury's decision not to award noneconomic damages raises an eyebrow. Nonetheless, neither the failure to award noneconomic damages nor the fact that the jury asked whether they could award any damages that they felt appropriate means that the jury compromised on the question of liability. In fact, they support the conclusion that the jury agreed on liability but either felt that the evidence did not support an award of noneconomic damages or compromised on the appropriate amount of damages to award. Likewise, the fact that the jury asked questions about liability near the end of their deliberations does not mean that the jury reached a compromise verdict. It is equally plausible that the jury revisited the liability issue after discussing damages or quickly reached a unanimous verdict on damages.

 The award of damages was not grossly inadequate. The fact that the jury did not award noneconomic damages does not make the award grossly inadequate. "Damages are not grossly inadequate merely because a jury awards less than the plaintiff has requested.... Where the damages have not been stipulated, the jury is entitled to believe that a claim does not merit an award." *Shugart*, 110 F.3d at 1505. While there certainly were close questions of liability, the court does not believe that this factor weighs in favor of defendants. The jury was not presented with an all or nothing liability question. Instead, the jury could have found liability on five different causes of action. The jury found for plaintiff on three counts and for defendants on two counts. This outcome makes it unlikely that the jury compromised on liability by entering a low damage award. Finally, the chronology of deliberations was not particularly unusual. The jury simply asked multiple questions, some related to liability and others related to damages. The order of the questions is not particularly significant because the jury was not instructed to consider liability first and to only discuss damages after deciding liability.

This case stands in stark contrast to decisions where courts have granted a new trial based on a compromise verdict. For example, in *Skinner v. Total Petroleum*, 859 F.2d 1439, 1446 (10th Cir.1988), the jury awarded approximately one-tenth of the damages claimed by plaintiff, a figure for which there was no support in the record. The jury asked to see portions of testimony related to liability, shortly after which it announced to the court that it was unable to reach a verdict, was instructed to continue to deliberate and then quickly returned a verdict in plaintiff's favor. The *Skinner* case is illustrative of the evidence needed to grant a new trial based on evidence of a compromise verdict. The court holds that defendants have not even approached the quantum of evidence of a compromise verdict necessary to justify a new trial.

G. American's separate argument for judgment as a matter of law or for a new trial

In addition to the arguments advanced by Reynolds, which American adopts, American argues in its motion that there was insufficient evidence for a reasonable jury to have found that smoking Lucky Strike cigarettes caused or contributed to Mr. Burton's injury. The court rejected this argument on summary judgment (Doc. 531), holding that a reasonable jury, based on the evidence in the summary judgment record, could have concluded that smoking Lucky Strike cigarettes caused or contributed to Mr. Burton becoming addicted and developing PVD. The evidence presented at trial was at least as strong as that in the summary judgment record and the court concludes that, based on the evidence presented at trial, a reasonable jury could have found that smoking Lucky Strike cigarettes caused or contributed to Mr. Burton's addiction and PVD.

The evidence at trial and in the summary judgment record indicated that Mr. Burton smoked Camel and Lucky Strike cigarettes between 1950 and 1993. Mr. Burton testified, consistent with the summary judgment record, that he smoked Lucky Strike cigarettes when Camel cigarettes were not available. At trial, American read into evidence portions of Mr. Burton's deposition where he admitted that, some years, he did not smoke Lucky Strike cigarettes at all and he could not remember the first or last time that he smoked Lucky Strike cigarettes.

As the court explained in its summary judgment order, to prevail, plaintiff needed to prove that smoking Lucky Strike cigarettes was a substantial factor in bringing about plaintiff's injury. *Roberson v. Counselman*, 235 Kan. 1006, 1012, 686 P.2d 149 (1984). Kansas follows a rule of comparative fault. A party is at fault when it is negligent and that negligence caused or contributed to plaintiff's injury. P.I.K.3d § 105.01. The substantial factor test should not be interpreted so as to undermine the principle of comparative fault. *Bockrath v. Aldrich Chemical Co.*, 21 Cal.4th 71, 86 Cal.Rptr.2d 846, 980 P.2d 398, 403 (1999). The Kansas Supreme Court looked to the Restatement for the meaning of "substantial" in *Counselman*, 235 Kan. at 1012, 686 P.2d 149. According to the Restatement, "substantial" is used to "denote the fact that defendant's conduct has such an effect in producing the harm as to lead reasonable men to regard it as a cause, using that word in the popular sense, in which there lurks the idea of responsibility, rather than the so-called 'philosophic sense,' which includes every one of the great number of events without which any happening [the injury] would not have occurred."

██ The court believes that a reasonable jury could have concluded, based on the evidence presented at trial, that smoking Lucky Strike cigarettes was a "substantial factor," as defined by the Re-

1214

statement, in bringing about Mr. Burton's addiction and PVD as opposed to a cause in the "philosophic sense." Dr. Grunberg testified that all of the cigarettes that Mr. Burton smoked during his life contributed to his addiction. Dr. Burns testified that each cigarette smoked damages the lining of a person's vascular system and that each cigarette smoked contributed to Mr. Burton's PVD.

American argues that the court should follow the decision in *Little v. Brown & Williamson Tobacco Corp.*, 98–1897–23 (D.S.C. Jan. 4, 2001), and enter judgment as a matter of law in its favor. American raised this argument in its motion for summary judgment and does not now make new points or discuss evidence that would impact the court's earlier analysis. The court believes that the *Little* decision is distinguishable and rejects American's argument for the reasons set out in its order denying summary judgment. American again argues that the court should follow *Lohrmann v. Pittsburgh Corning Corp.*, 782 F.2d 1156 (4th Cir.1986) without making new points or suggesting that the evidence presented at trial impacts the court's earlier ruling. The court rejects the argument for the reasons set out in its summary judgment order.

IT IS THEREFORE ORDERED that Reynolds' (Doc. 653) and American's (Doc. 655) motions for judgment as a matter of law or a new trial are denied.

IT IS FURTHER ORDERED that the separate proceeding for the purpose of making an award of punitive damages will be held on May 16, 2002, beginning at 9:30 a.m.